## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BLUEFIELD

DANIEL A. IRWIN,

      Plaintiff,

vs.                                        Civil Action No. 1:21-cv-00289

A. DAMEWOOD, individually,
D.R. KINCAID, individually,
R.L. JONES, individually,

      Defendants.

## COMPLAINT

This complaint, brought pursuant to 42 U.S.C. Section 1983 and 42 U.S.C. Section 1985, as well as the Fourth Amendment to the United States Constitution, arises out of the Defendants' unreasonable search and seizure and wrongful arrest of the Plaintiffs on or about May 23, 2019 on Garden Crest Road, located in Mercer County, West Virginia, within the Southern District of West Virginia.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1331 and 1343.

## PARTIES

1.      The Plaintiff, Daniel A. Irwin, was at all times relevant hereto a resident of Ashland, Kentucky.

2.      The three defendants are all law enforcement officers employed by the State of West Virginia and were at all times hereto acting under color of law. They are named in their individual capacities. They are not named in their official capacities.

3. Defendant A. Damewood was at all times relevant hereto a law enforcement officer with the West Virginia Department of Natural Resources and was at all times relevant hereto acting under color of law, having an address located at Garden Crest Road, Mercer County, West Virginia.

4. Defendant D.R. Kincaid was at all times relevant hereto a trooper with the West Virginia State Police and was at all times relevant hereto acting under the color of law, having an address of 910 Oakvale Road, Princeton, West Virginia.

5. Defendant R.L. Jones was at all times relevant hereto a trooper with the West Virginia State Police and was at all times relevant hereto acting under the color of law, having an address of 910 Oakvale Road, Princeton, West Virginia.

**FACTS**

6. Plaintiff Daniel Antarr Irwin is an African American male who resides in Ashland, Kentucky. His father was a sheriff's deputy in the Ashland, Kentucky area. He is a self employed contractor who installs fiber optic cables through West Virginia, pursuant to the ongoing effort at bringing high speed internet to rural West Virginia. He has personally installed dozens of fibre optic splice points from Ashland, Kentucky, throughout rural West Virginia.

7. On or about May 23, 2019, Plaintiff was installing fibre optic cables in the Mercer County, West Virginia area. In so doing, Plaintiff performs his work within the applicable utility right-of-ways, at the request of a North Carolina company who was contracted by Suddenlink Communications to perform the work. In order to perform the installations, Plaintiff utilizes a utility construction bucket truck, along with a small camper, which serves as a "splice trailer."

8. Just prior to arriving at the subject work site that was the site of the incident described herein, Plaintiff was working at a right-of-way at the residence of a West Virginia State Police trooper who was kind enough to allow Plaintiff to park in his driveway, so as not to require additional manpower to perform traffic control during the installation process.

9. However, after leaving that location and traveling to the next "splice point," located on Garden Crest Road, in Mercer County, West Virginia, Plaintiff encountered a law enforcement officer homeowner who was much less kind than the prior state trooper.

10. In the late afternoon of May 23, 2019, Plaintiff and a fellow cable-splicer arrived at a splice point just off exit 14 of Interstate 77. He was directed to the location by the contracting company overseeing the installation for Suddenlink.

11. Joseph Evans, a fellow cable-splicer and Plaintiff's coworker for the project, first drove a small van to the location to confirm it was the correct location for the splice point, which it was. Plaintiff then drove the bucket truck and camper to the location to begin work. Mr. Evans is a white male. His presence did not result in any law enforcement presence at the scene.

12. Plaintiff then arrived at the location on Garden Crest Road, which is off Route 7 in Mercer County, at the point where it intersects with the applicable utility right-of-way. Garden Crest Road is a single lane gravel public roadway located in Mercer County, West Virginia.

13. Unbeknownst to Plaintiff at the time, Defendant A. Damewood, a West Virginia Department of Natural Resources police officer, utilizes Garden Crest Road to access his residence. The subject roadway was narrow and appeared to Plaintiff to be an extremely low traffic roadway.

14. Plaintiff backed his work-truck and camper up the narrow roadway and parked the bucket truck in such a way so as to enable Plaintiff to reach the splice point within the utility right-of-way. In so doing, Plaintiff partially blocked the roadway. As work began, Mr. Evans, Plaintiff's coworker, took responsibility for controlling traffic around the partial blockage.

15. One of several vehicles which passed included a woman in a white pickup truck She pulled up and spoke to the men. Rather than drive into the grass on the edge of the blocked roadway, she said she was able to use a separate access road to get to her home. She said it was "no problem," and backed her vehicle up and took an alternate roadway to her home. She was able to access her residence despite the temporary partial blockage of Garden Crest Road at the work site. The interaction with the woman had been friendly and problem-free. Upon information and belief, the woman was the spouse of Defendant Damewood.

16. Shortly afterwards, Defendant Damewood arrived at the work site in a marked Department of Natural Resources police cruiser pickup truck. Damewood was not in uniform and was wearing a shirt with the sleeves cut-off. When Damewood approached, he appeared hostile and immediately announced, "this is my driveway - you're not allowed to block my driveway."[1]

17. The men politely told Defendant Damewood about the woman in the white pickup truck, who said that there was another way around, or else he could drive around them in the grass, if he didn't want to use the other route. Damewood angrily responded, "that was my wife, and no I will not put my truck in four wheel drive and drive through the mud [to get around them]."

---

[1] It was not his driveway, but rather a public roadway.

18. Instead of just going around them, or using the alternate route that his wife had used, Defendant Damewood just decides to wait and stare at the men, while sitting in his police cruiser. The men told him that they would be just a few more minutes before their work was completed.

19. Rather than waiting however, Defendant Damewood attempts to escalate the situation into a confrontation. He demands that they move completely off "his driveway" and that he owns a "30 foot easement" across the roadway, and that they couldn't be anywhere within 30 feet of what he was claiming was his driveway. Noticing the camper trailer being pulled behind the bucket truck, Damewood proceeds to tell the men that they cannot camp within 30 feet of his "driveway."

20. In fact, the roadway was not his driveway, but rather was a public road. Moreover, the men were working within the applicable utility easement and were properly permitted and legally entitled to be where they were working.

21. Plaintiff explained to Damewood that the trailer was a cable splicing trailer, and that they were utility workers, and that he had all the permits to be at the location, which was a utility right-of-way.

22. Damewood responded that the men had to move; that they were within his 30 foot right-of-way for his driveway and were required to leave.

23. Damewood then contacted law enforcement dispatch and began to run the license plates of the utility vehicles, which had Kentucky license plates. Dispatch read back the vehicle registration information to Damewood.

24. After being provided with the vehicle registration information by dispatch, Damewood then complained to the dispatcher that "they're crossing the driveway down here, so we're having some issues, so I'm gonna be out here for a little bit." At no point does he notify the dispatcher that he's claiming the road is his own personal driveway. At no point does he clarify whether or not he was on duty at the time.

25. During his conversations with the emergency dispatch center, Defendant Damewood is using his law enforcement radio and identifying himself as "DNR48." He says, "DNR48 to control… send me a trooper down here to my location, Garden Crest Road."

26. Dispatch the radios a nearby state police unit to the location and says, "I need a DPS Unit I request for your assistance; DNR48 is out on Garden Crest Road dealing with some subjects, he's requesting assistance."[2]

27. Defendant state trooper Kincaid responds to dispatch, inquiring as to the reason why Defendant Damewood needs assistance. Dispatch informs Kincaid that Damewood "was running 28's and was dealing with people blocking driveways…."[3]

28. Dispatch then informs Defendant Damewood that the troopers were en route, and asks, "what's exactly going on at this time?" Damewood responded, "I had some guys in my driveway there. They've moved over so where we can get around them. It's some power people though…."

---

[2] Plaintiff's counsel obtained the dispatch communications via Freedom of Information Act request, which contains both the audio of the communications, as well as the "CAD sheet."

[3] 10-28 is law enforcement code for running vehicle registration checks.

29. Kincaid then asks dispatch, "10-4, does he still need us?" Dispatch asks Damewood, "do you still need assistance?" "Yeah, I still need these guys out of here." Kincaid responds, "10-4."

30. Shortly afterwards, defendants Kincaid and Jones arrive at the location in a single marked police cruiser. They exited the cruiser and walked over towards Defendant Damewood. Plaintiff observed Damewood shouting at the officers, and heard him demanding, "I want their names, I want their addresses, and I want to know where they're from!"

31. Defendant Kincaid then walked over to Plaintiff, who was still on his job site within the utility right-of-way along the public roadway. He asked Plaintiff for his identification.

32. Plaintiff responded, "yes, I just don't want [Damewood] to have it."

33. Kincaid said, "that's not how this works, turn around and put your hands behind your back." Kincaid handcuffed Plaintiff immediately and placed him under arrest.

34. Kincaid placed Plaintiff under arrest before asking him any questions and prior to undertaking any investigation. Moreover, Kincaid never allowed Plaintiff the opportunity to hand him his ID.

35. The troopers had been at the site for approximately one minute, or less, prior to arresting the Plaintiff.

36. After being placed in handcuffs, Plaintiff explained to Kincaid and Jones that he was a utility worker and working within the utility right-of-way, and that he has all the requisite permits, and can provide the officers with verification of the same. Defendant Kincaid said, "it's too late for that."

37. Kincaid and Jones took the Plaintiff over to the police cruiser. They emptied his pockets. They then took Plaintiff's driver's license over to Defendant Damewood and gave it to him so that he could obtain Plaintiff's personal information.

38. Kincaid and Jones then placed Plaintiff in the rear of the police cruiser. They looked towards Plaintiff's coworker, and said, "do you want to go to jail, or are you giving us your ID?" The coworker reached into his pocket, pulled out his ID, and handed it over to the troopers, also asking them not to give the ID to Defendant Damewood. However, without even running the coworker's ID, the troopers merely handed the ID to Damewood.

39. The coworker was then told to remove all of the vehicles off "the property." He was forced to drive the first vehicle 2.5 miles down the road to a church, where he then had to walk back to get the other vehicle, to also drive 2.5 miles away from the job site.

40. Plaintiff was then transported to the state police detachment in Princeton, West Virginia for processing. He was then taken to Southern Regional Jail, in Beaver, West Virginia, where he was incarcerated for approximately 24 hours.

41. Plaintiff was charged pursuant to the warrantless arrest with violations of WV Code § 61-5-17(a), obstruction of an officer, and WV Code § 61-3B-3(b), trespassing. He was forced to post $1,000.00 cash bond.

42. Plaintiff was appointed an assistant public defender, Stephanie Pfieffer, to represent him on the criminal charges. She quickly determined and verified that Garden Crest Road was a public road, and that the Plaintiff was properly permitted and licensed to perform utility work within the utility right-of-way which intersects Garden Crest Road. She further determined that at no time was Plaintiff on Defendant Damewood's private property, nor in

Damewood's driveway, which was clearly indicated at the scene by the fact that the road had marked signage designating it as "Garden Crest Road."

43.    Attorney Pfieffer met with the Prosecuting Attorney of Mercer County and explained the circumstances. Within a couple of days, she received a dismissal order, where the Prosecuting Attorney voluntarily dismissed all criminal charges against the Plaintiff.

44.    Plaintiff continues to serve the State of West Virginia by installing high speed fibre optic cables.

### COUNT ONE - UNREASONABLE SEARCH AND SEIZURE
### (Damewood)

45.    Plaintiff incorporates by reference all of the previous paragraphs.

46.    On May 23, 2019, Defendant A. Damewood, under color of law, seized the Plaintiff, within the meaning of the Fourth Amendment, while the Plaintiff was attempting to perform his job of utility work installation on Garden Crest Road, Mercer County, West Virginia. By an overt show of authority, Defendant Damewood retained the liberty of the Plaintiff, subjecting him to what as essentially a stop or investigatory detention, thereby "seizing" him under the Fourth Amendment. *See* Terry v. Ohio, 392 U.S 1, 19 (1968).

47.    At the time Plaintiff was seized by Defendant Damewood, he was not suspected of having committed any crime. Nor was any crime suspected to have occurred. He was merely doing his job as a utility worker installing fiber optic cables within the utility right-of-way, which he was entitled and permitted to do.

48. Defendant Damewood, although wearing a backwards baseball cap and wearing a cut-off shirt, was driving in his DNR-issued police cruiser and otherwise acted as if he was on-duty and acting under color of law. He overtly was in communication with emergency dispatch, running the Plaintiff's vehicle registration numbers, while also blocking the Plaintiff from leaving, should he have chosen to attempt to leave, by Damewood himself blocking the roadway with his cruiser.

49. Defendant Damewood had no reasonable suspicion to believe that the Plaintiff had committed any crime.

50. Nevertheless, Defendant Damewood committed a Fourth Amendment seizure by continuing in his show of authority until such time as state police officers could arrive on the scene to take the Plaintiff into custody.

51. There had been no complaint received by Damewood, nor any allegation of criminal wrongdoing by any individual, about the Plaintiff to necessitate an investigatory detention of the Plaintiff or his coworker.

52. Upon information and belief, the only possible reason for Defendant Damewood being upset by Plaintiff's presence in the area was the fact that Plaintiff is an African American. Damewood had no prior knowledge of the Plaintiff, who travels throughout the state and had never been to Garden Crest Road before. In fact, Plaintiff's coworker, who is white, had previously been to the site and had not elicited an objection, complaint, or response from Defendant Damewood.

53. No objectively reasonable police officer would believe that he could seize a utility worker and perform an investigatory detention of that individual, or otherwise restrain or affect

10

their liberty, based solely on the skin color of the utility worker, or for any other improper or illegal reason, rather than a legitimate and founded reasonable suspicion of criminal activity.

54. Defendant Damewood's actions were taken under color of law, objectively unreasonable, willful, wanton, intentional and done with a callous and reckless disregard for the Plaintiff's Fourth Amendment rights to be free from unreasonable search and seizure.

55. Plaintiff suffered damages for which he is entitled to recover.

## COUNT TWO - UNREASONABLE SEARCH AND SEIZURE (False Arrest) (Damewood, Kincaid and Jones)

56. Plaintiff incorporates by reference all of the previous paragraphs.

57. On May 23, 2019, all three defendant police officers jointly participated in a search and seizure of the Plaintiff and a warrantless arrest of the Plaintiff for allegedly trespassing and for allegedly obstructing an officer pursuant to WV Code § 61-5-17(a) and WV Code § 61-3B-3(b).

58. Defendant Kincaid was the arresting officer. However Defendant Jones was present and participated. Defendant Damewood did not physically involve himself in the arrest of the Plaintiff. However, he directed the actions of the other two defendant police officers, as described above in detail.

59. Defendants seized the Plaintiff and arrested him without a warrant, and without probable cause that he had committed a crime.

60. At the time of the Plaintiff's arrest, the facts and circumstances within the defendants' joint knowledge, as well as those available to the defendants individually, were not sufficient to warrant a reasonably prudent person to believe in the circumstances shown that

Plaintiff had committed a crime. Therefore there was no probable cause at the time of the arrest. Although in criminal cases the question of whether a police officer had probable cause to make an arrest is a question for the court to decide, there is substantial authority that in § 1983 cases this issue should be submitted to the jury upon proper instructions defining probable cause. Thacker v. City of Columbus, 328 F.3d 244 (6th Cir. 2003); Montgomery v. De Simone, 159 F.3d 120 (3d Cir. 1998); McKenzie v. Lamb, 738 F.2d 1005 (9th Cir. 1984); Weyant v. Okst, 101 F.3d 845 (2d Cir. 1996).

61. On the charge for allegedly trespassing, in violation of WV Code § 61-3B-3(b), there is a requirement that the subject be on the private property of another, and that that the subject be asked to leave and thereafter refuse to leave. However, Plaintiff was not on private property and was properly permitted to perform utility work within the utility right-of-way. He communicated this fact to all of the defendant police officers and offered to show them the paperwork. However, they didn't care and didn't want to see the paperwork, nor hear the explanations. Plaintiff was never asked to leave the worksite by defendants Kincaid and Jones prior to being placed under arrest.

62. On the charge of allegedly obstructing an officer, in violation of WV Code § 61-5-17(a), the plain language of the statute establishes that a person is guilty of obstruction when he, "by threats, menaces, acts or otherwise forcibly or illegally hinders or obstructs or attempts to hinder or obstruct a law-enforcement officer, probation officer or parole officer acting in his or her official capacity." The Fourth Circuit recently examined the statute:

> As West Virginia's high court has "succinct[ly]" explained, to secure a conviction under section 61-5-17(a), the State must show "forcible or illegal conduct that interferes with a police officer's discharge of official duties." State v. Davis, 229 W.Va. 695, 735 S.E.2d

12

570, 573 (2012) (*quoting* State v. Carney, 222 W.Va. 152, 663 S.E.2d 606, 611 (2008) ). Because conduct can obstruct an officer if it is either forcible or illegal, a person may be guilty of obstruction "whether or not force be actually present." Johnson , 59 S.E.2d at 487. However, where "force is not involved to effect an obstruction," the resulting obstruction itself is insufficient to establish the illegality required by section 61-5-17. Carney , 663 S.E.2d at 611. That is, when force is not used, obstruction lies only where an illegal act is performed. This is because "lawful conduct is not sufficient to establish the statutory offense." Id.

Of particular relevance to our inquiry here, West Virginia courts have held that "when done in an orderly manner, merely questioning or remonstrating with an officer while he or she is performing his or her duty, does not ordinarily constitute the offense of obstructing an officer." State v. Srnsky, 213 W.Va. 412, 582 S.E.2d 859, 867 (2003) (*quoting* State ex rel. Wilmoth v. Gustke, 179 W.Va. 771, 373 S.E.2d 484, 486 (W. Va. 1988)).

Hupp v. State Trooper Seth Cook, 931 F.3d 307 (4th Cir. 2019).

63. In the sparse police report filed after the incident and utilized in the Criminal Complaint against the Plaintiff, Defendant Trooper Kincaid provided the following narrative:

On Thursday May 23, 2019 at approximately 1910 hours, the undersigned officer and TPR. R.L. Jones responded to a trespassing complaint on Garden Crest Road. When the above stated officers arrived on scene they spoke with the complainant Officer Damewood of the Department of Natural Resources. Officer Damewood advised his privately owned driveway had been blocked by two vehicles. Officer Damewood additionally advised he spoke with the drivers of the vehicles, two male subjects, and requested them to remove their vehicles from his property, to which they refused. The undersigned officer approached the male subjects and requested them to produce their driver's license or identification card. One of the male subjects identified as Daniel Irwin refused to produce any identification after multiple requests at which time he was placed under arrest. This incident did occur in Mercer County, West Virginia.

64. Additionally, the same narrative, verbatim, was also included in a West Virginia State Police Report of Criminal Investigation, where the "place of crime" was described by Defendant Kincaid as "a privately owned driveway located on Garden Crest Road." The statements were false, in that the location was actually on Garden Crest Road, a public roadway - not on a "privately owned driveway located on Garden Crest Road." Moreover, the narrative

13

included the false allegation that Plaintiff was asked multiple times to produce identification. He never refused to produce identification to the arresting officer. He merely requested that his identification not be given to Defendant Damewood.

65. Additionally, even assuming that Plaintiff "refused to produce any identification after multiple requests" which then resulted in his arrest, the Plaintiff did not commit obstruction under WV Code § 61-5-17(a). The West Virginia Supreme Court of Appeals has held that in a non-traffic investigative detention, that refusal to identify oneself to a law enforcement officer does not, standing alone form the basis for a charge of obstructing a law enforcement officer:

> Our previous decisions lead us to conclude that refusing to give one's name to a police officer, standing alone, does not constitute obstruction. The evidence in the case before us does not establish that Brian unlawfully interfered with the officers carrying out their duties since he was not under arrest at the time he was questioned and he was not informed by the officers that they had a warrant for his arrest or the basis on which the warrants they had were issued
>
> Moreover, if mere questioning of an officer does not constitute unlawful obstruction, it stands to reason that silence alone cannot establish the offense. Consequently, we hold that refusal to identify oneself to a law enforcement officer does not, standing alone, form the basis for a charge of obstructing a law enforcement officer in performing official duties.
>
> However, the charge of obstructing an officer may be substantiated when a citizen does not supply identification when required to do so by express statutory direction or when the refusal occurs after a law enforcement officer has communicated the reason why the citizen's name is being sought in relation to the officer's official duties.

State v. Srnsky, 582 S.E.2d 859, 868, 213 W. Va. 412 (W.Va., 2003). "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." State ex rel. Wilmoth v. Gustke, 179 W.Va. 771, 773-74 373 S.E.2d 484, 486-87 (1988).

14

66. There was no statutory requirement that Plaintiff provide identification. This was a non-traffic investigatory detention. Plaintiff's vehicles were parked prior to the commencement of the stop/confrontation by Damewood. Rather, he confronted Plaintiff when he was out of his vehicle and attempting to perform utility work within the utility right-of-way. That stop continued until Kincaid and Jones arrived and arrested the Plaintiff. Prior to placing the Plaintiff in handcuffs and arresting him, neither of the defendants communicated any reason why the Plaintiff's name was sought by the officers in their official duties. Nor was there a warrant for the Plaintiff's arrest, nor any such circumstance so as to make an alleged non-compliance with identification illegal under the obstruction statute. There was no allegation of criminal activity which was being investigated at the time Plaintiff was placed under arrest. Nor was there any crime being investigated.

67. Upon information and belief, the only reason the Plaintiff was targeted is due to his skin color. Plaintiff is African American. All defendant officers are white males.

68. The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. A seizure is unreasonable under the Fourth Amendment if it is not based on probable cause. Dunaway v. New York, 442 U.S. 200, 213, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Thus, "[i]f a person is arrested when no reasonable officer could believe ... that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues." Rogers v. Pendleton, 249 F.3d 279, 290 (4th Cir. 2001) (citation omitted).

69. "Probable cause is determined by a 'totality-of-the-circumstances' approach." Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017) (*citing* Illinois v. Gates, 462 U.S. 213, 230,

103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ). The inquiry "turns on two factors: 'the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.' " Id. (*quoting* Graham v. Gagnon, 831 F.3d 176, 184 (4th Cir. 2016) ). While the Court looks to the information available to the officer on the scene at the time, the Court applies an objective test to determine whether a reasonably prudent officer with that information would have thought that probable cause existed for the arrest. Graham, 831 F.3d at 185. Evidence sufficient to secure a conviction is not required, but probable cause exists only if there is sufficient evidence on which a reasonable officer at the time could have believed that probable cause existed for the arrest. Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963).

70. No reasonable officer in either of the three defendant police officers' positions would have believed that probable cause existed for the Plaintiff's arrest. Plaintiff was a utility worker working with all applicable permits and licenses, within the utility right-of-way along a marked public roadway. He therefore could not have been trespassing. Nor was he asked to leave by any of the defendants prior to being arrested. Nor is it a stand-alone crime in West Virginia to allegedly refuse to provide identification when asked by police officers where there's no statutory direction to do so, nor any explanation provided by the officers regarding the reason for their request for identification.

71. Plaintiff suffered damages, for which he is entitled to recover.

**COUNT THREE - CONSPIRACY TO DEPRIVE
CIVIL RIGHTS UNDER 42 U.S.C. 1985
(Damewood, Kincaid and Jones)**

72. Plaintiff incorporates by reference all of the previous paragraphs.

73. Defendants Damewood, Kincaid and Jones, conspired for the purpose of depriving, either directly or indirectly, the Plaintiff of the equal protection of the laws of the United States and/or of the equal privileges and immunities under the laws of the United States.

74. Plaintiff is African American. He was merely trying to perform his job as a utility worker, lawfully working within the utility right-of-way. He was targeted by A. Damewood due to his being African American. Due to the color of Plaintiff's skin, Damewood demanded to know his identity and his personal information, such as his home address - despite the fact that he had no right to such information. He contacted two fellow law enforcement officers to forcibly obtain the information for him and ultimately to forcibly remove the Plaintiff and his vehicles from the utility right-of-way near Damewood's home. Such actions would not have been taken but for the fact that Plaintiff is African American.

75. In furtherance of the conspiracy, Plaintiff was arrested illegally by Defendant Kincaid and Defendant Jones, who were members of the conspiracy with Damewood, and acting in furtherance of the conspiracy, transported to jail, and spent approximately 24 hours incarcerated. Plaintiff's coworker, who was white, was not arrested, and was forced to remove the Plaintiff's utility vehicles approximately 2.5 miles down the road to a church parking lot.

76. Plaintiff suffered damages, for which he is entitled to recover pursuant to 42 U.S.C. 1985(c).

**PRAYER**

WHEREFORE, based on the above stated facts, the plaintiffs respectfully requests that this Honorable Court award:

1. Damages against the defendants in an amount to be determined at trial which will fairly and reasonably compensate the plaintiffs for all compensatory damages to be proven at trial;

2. Punitive damages against the individual defendants in an amount to be determined at trial; and

3. Reasonable attorney fees and costs pursuant to 42 U.S.C. 1988.

**PLAINTIFFS DEMAND A TRIAL BY JURY**

                                          DANIEL A. IRWIN,
                                          By Counsel

/s John H. Bryan
John H. Bryan (WV Bar No. 10259)
JOHN H. BRYAN, ATTORNEY AT LAW
411 Main Street
P.O. Box 366
Union, WV 24983
(304) 772-4999
Fax: (304) 772-4998
jhb@johnbryanlaw.com